In the spring of 1994, the Plaintiff was under the care of Dr. William Gough, a physician specializing in arthritis and rheumatology in Asheville, North Carolina. She had been seeing Dr. Gough on a consistent basis since 1990, and he was treating her for both the arthritic condition in her right knee and for fibromyalgia. In the spring of 1994, Ms. Graves was asked to participate in a rehabilitation effort by the Defendants. To coordinate that effort, the Defendants had hired an Asheville vocational rehabilitation firm named Holder Radford, and had directed them to send Ms. Graves to Dr. Paul Saenger, an orthopedic doctor in Asheville. Ms. Graves had seen Dr. Saenger for a second opinion on one occasion on July 30, 1990.
The Plaintiff was concerned about the details of the rehabilitation plan, and asked Dr. Gough to comment on the appropriateness of the plan. On February 17, 1994, Dr. Gough concluded that "the only way to possibly help the patient re-enter the work field is to provide her extensive re-education to allow her to perform higher cognitive activities such as those of a paralegal. Even with such training my estimate would be that her ability to work full time even at limited activities would be questionable."
Nonetheless, Ms. Graves saw Dr. Saenger on March 15, 1994. He examined the Plaintiff, and endorsed the rehabilitation plan being proposed. The Plaintiff testified, however, that Dr. Saenger did not discuss with her the effect of her fibromyalgia. Ms. Graves subsequently was directed to undergo an examination by a physical therapist in Franklin, North Carolina, and on April 5, 1994, she complied. That evening, after undergoing the examination, Plaintiff presented at the emergency room of District Memorial Hospital in Andrews, North Carolina, complaining of tenderness and pain in the right knee. Thereafter, the Defendants' rehabilitation firm directed Ms. Graves to report to Industrial Opportunities, Inc (IOI), a sheltered workshop in Marble, North Carolina, on April 11, 1994. Ms. Graves went to Marble, but refused to tour the premises.
Concerned about her knee and the course and tenor of the rehabilitation plan, the Plaintiff went back to Dr. Gough on April 18, 1994. He reported that in his view, he did "not think that she will tolerate any type of repetitive type motion manufacturing type activities." Ms. Graves advised Holder Radford that she would follow the advice of Dr. Gough, and would be happy to participate in cognitive re-training, but not the plan then being contemplated. She further advised the Defendants that she did not consider Dr. Saenger to be her physician, and that she believed Dr. Gough to be her treating physician.
In order to resolve the dispute, Caroline Fortner, then a rehabilitation nurse with the Industrial Commission, was asked to intervene. She arranged an independent medical examination with Dr. Thomas Buter, an orthopaedic surgeon in Charlotte, which took place on August 30, 1994. Dr. Buter endorsed the rehabilitation plan from an orthopedic perspective, but conceded that he had "no specific comments regarding the fibromyalgia, since this is not in my area of expertise."
At about that same time, Ms. Fortner made a determination that, in her opinion, Dr. Saenger should be the treating physician in the case.
Despite her misgivings, Ms. Graves reported to IOI on September 29, 1994, for a tour of the facilities, and thence again on October 3, 1994, to begin work. Ms. Graves reported significant pain from the effort, and did not again report to the facility. On October 6, 1994, she returned to Dr. Gough, who found her fibromyalgia to have flared and her knee to be "somewhat worse" than in her visit in April. He concluded that it "sounds as if the job which she was placed in also required repetitive motion activities which would cause her fibromyalgia symptoms to flare." On October 12, 1994, she also returned to Dr. Saenger, who concluded that he could find nothing which would explain the problems the Plaintiff was having.
The Defendants then filed a Form 24, seeking to terminate her compensation, on December 21, 1994. That motion was allowed after a telephonic hearing, the order being entered on February 20, 1995.
In my view, plaintiff's refusal to follow through on therehabilitation plan was not unreasonable.
The rehabilitation plan designed by the Defendants, and implemented by Holder Radford, was, from the very beginning, short-sighted and afflicted with tunnel vision. Seemingly consciously, it ignored the whole person in order to focus only on a specific condition.
Without a doubt, the law allows insurers to formulate and carry out rehabilitation plans in an effort to help injured workers regain their ability to work N.C. Gen. Stat. § 97-25 and § 97-27. Quite properly, claimants are required to participate in good faith in properly designed programs. Such programs, however, must be designed taking into account the specific limitations under which the claimant labors. Bridges v Linn-Corriher Corp.,90 N.C. App. 397, 368 S.E.2d 388 (1988). A program designed to address only one condition, and not taking into account other conditions suffered by the Plaintiff, is not a legitimate rehabilitation effort.
At the hearing in the case, Linda Ownbey, the case manager for Holder Radford, the rehabilitation firm employed by the Defendants, testified that she was directed at the outset by the insurer to schedule Ms. Graves to see Dr. Saenger. Ms. Ownbey testified that Farm Bureau told Holder Radford that Dr. Saenger was the treating physician, and did not reveal that Ms. Graves had not seen Dr. Saenger in four years. At that time, of course, by virtue of being in possession of his records, the insurer was aware of the fibromyalgia and Dr. Gough's belief that Ms. Graves was totally disabled.
Despite this, the initial referral from Farm Bureau did not mention the presence of fibromyalgia. Ms. Ownbey conceded that it was important to factor in the fibromyalgia in the rehabilitation plan, and that her own knowledge of the condition was not particularly detailed. Ms. Ownbey testified that she became aware of Dr. Gough's views regarding the rehabilitation plan in the spring of 1994, but that the plan she formulated had nothing to do with the type of cognitive re-training called for by Dr. Gough. Indeed, Ms. Ownbey conceded that the coordinator at IOI, Lynn Woodruff, was not explicitly informed by Holder 
Radford that Ms. Graves suffered from fibromyalgia. She suggested that Ms. Woodruff would have derived that from the medical records, but then conceded that she could not say whether or not Dr. Gough's records were ever provided to Ms. Woodruff. Dr. Saenger, who is an orthopedic surgeon with no expertise in fibromyalgia, simply evaluated from an orthopedic standpoint. There is substantial doubt as to whether or not Dr. Saenger had been informed of the fibromyalgia or Dr. Gough's views at the time of that exam, since his record notes that "[S]he (Ms. Graves) also states that she has developed fibromyalgia since this all developed, i e, since her knee injury." Ms. Ownbey testified that she had told Dr. Saenger that Ms. Graves suffered from arthritis, but not fibromyalgia. She also testified that while it would have been important for the physical therapist, Matt Hornsby of Healthworks, who examined Ms. Graves on April 5, 1994, to know of the fibromyalgia, she had no recollection of informing him of the condition. Despite these oversights and omissions, however, the plan proceeded apace.
The record reflects that on April 15, 1994, a packet of materials was provided to Dr. Gough by Holder Radford describing the program at IOI, presumably in an effort to have Dr. Gough endorse the program. On April 18, Dr. Gough dictated a report that concluded that the plan then underway was completely inappropriate for Ms. Graves. Incredibly, Ms. Ownbey's response to that report was to conclude that "it is apparent that Dr. Gough did not review this information (the IOI information) before discussing with the client his recommendations of continued vocational assistance." Is it any wonder that a conflict developed between the parties regarding the plan?
Unfortunately, the error was compounded by Ms. Fortner. It may well have been appropriate for Ms. Fortner to order an orthopedic evaluation. In and of itself, however, that exam was not sufficient to review the whole person, including the fibromyalgia. Indeed, Dr. Buter was remarkably candid when he confessed that the effects of fibromyalgia were beyond his expertise, and that his evaluation was purely an orthopedic. Unfortunately, no effort was thereafter made to address the specific limitations from which Ms. Graves suffered.
Randy Adams, an expert in vocational evaluation and rehabilitation, and a former director of the Center for Work Rehabilitation and Pain Management at Thoms Rehabilitation Hospital in Asheville, testified in deposition that it was not within the standards of the profession to formulate a rehabilitation plan taking into account only Ms. Graves' osteoarthritis, and not the fibromyalgia. He evaluated Ms. Graves himself, administering to her a battery of mental and physical tests. He concluded that the IOI program was inappropriate for Ms. Graves in light of her array of physical problems. Mr. Adams noted that he was familiar with IOI, and had referred clients to the program himself. He pointed out, however, that all of the positions at IOI involve repetitive motion, which aggravates fibromyalgia. He concurred in the recommendations of Dr. Gough and Ms. Graves' later physician in 1995, Dr. Ali Marhaba, that the only appropriate rehabilitation program was one involving cognitive education and retraining, but even at that he concluded that she was not employable.
Mr. Adams also addressed a contention of the Defendants that Ms. Graves had not put forth full effort in the physical capacity evaluation performed by Matt Hornsby on April 5, 1994. Mr. Hornsby noted that Ms. Graves' performance in the maximum voluntary effort tests suggested that "she did not give full effort throughout the entire testing process" and concluded that "it's been my experience that patients who routinely rank below the fifth percentile are not giving full effort during the testing process." Mr. Adams, however, noted that most maximum voluntary effort tests utilize the upper extremities, which are the very areas affected by the fibromyalgia. The lack of success in these tests suggested to Mr. Adams that Mr. Hornsby was not aware of the fibromyalgia. Mr. Adams administered one of the same tests, the Perdue Peg Board test, and found that Ms. Graves tried hard, but performed very poorly. He found this to be consistent with Dr. Gough's observations and findings.
In sum, it is readily apparent that the rehabilitation plan in this case was not at all appropriate for someone with Ms. Graves' specific limitations. Ms. Graves made an honest effort to comply, but the shortcomings of the plan itself doomed any effort to failure. It is not in compliance with the law to now hold Ms. Graves responsible for that failure.
PLAINTIFF IS ENTITLED TO ADDITIONAL COMPENSATION UNDER THE ACT.
In and to the extent that Plaintiff was unjustifiably cut off, it follows that she is entitled to additional benefits. If the Defendants desire, she has shown herself more than willing to participate in a rehabilitation plan that has been intelligently tailored to address her limitations and abilities. Failing that, Drs. Gough and Marhaba and Mr. Adams are in agreement that Ms. Graves is completely and totally disabled, and she is entitled to benefits on that basis.
In my view, the Deputy Commissioner and the majority of the Full Commission panel reviewing this case erred in finding that the Plaintiff unreasonably refused to cooperate in the rehabilitation plan in this case. All reliable evidence in the record indicates that the plan was, at best, ill-conceived and completely inappropriate, and that under the circumstances Ms. Graves made her best effort to comply. Having found that, it follows that Ms. Graves is entitled to additional benefits, either during a period of appropriate rehabilitation, or as completely and totally disabled.
In this case the Industrial Commission is in violation of its own rules regarding rehabilitation. Section I (E) (3) of those rules provide, in pertinent part: "Placement shall only be directed toward prospective employers offering the opportunity for suitable employment." That rule is violated when a worker is directed toward a prospective employment that would be impossible in view of the worker's medical condition. The Commission is also in violation of its rehabilitation rule I (G), which provides: "`Suitable employment' means employment in the local labor market or self-employment which is reasonably attainable and which offers an opportunity to restore the worker as soon as possible and as nearly as practicable to pre-injury wage, while giving dueconsideration to the worker's qualifications (age, education, work experience, physical and mental capacities), impairment,
vocational interests, and aptitudes." Emphasis supplied.
This 3rd day of February, 1998.
 S/ ____________ THOMAS J. BOLCH COMMISSIONER